# 25-222-cr(L),
# 25-223-cr(CON), 25-224-cr(CON)

## United States Court of Appeals
### for the
### Second Circuit

———————

UNITED STATES OF AMERICA,

*Appellee,*

– v. –

ALON ALEXANDER, OREN ALEXANDER, TAL ALEXANDER,

*Defendants-Appellants.*

———————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## JOINT REPLY BRIEF FOR DEFENDANTS-APPELLANTS
## ALON ALEXANDER AND OREN ALEXANDER

RICHARD C. KLUGH
LAW OFFICE OF RICHARD C. KLUGH
*Attorney for Defendant-Appellant*
  *Oren Alexander*
40 NW 3rd Street, PH1
Miami, Florida 33128
(305) 903-6900

HOWARD M. SREBNICK
JACKIE PERCZEK
ALEXA KLEIN
JEANELLE GOMEZ
BLACK SREBNICK
*Attorneys for Defendant-Appellant*
  *Alon Alexander*
201 South Biscayne Boulevard, Suite 1300
Miami, Florida 33131
(305) 371-6421

 (800) 4-APPEAL • (381364)

# <u>TABLE OF CONTENTS</u>

**Page**

TABLE OF AUTHORITIES ................................................................... ii

INTRODUCTION .................................................................................1

I.      Standard of Review ........................................................3

II.     Private Security is Not a Statutorily or Constitutionally
Prohibited Condition of Release ..........................................5

        A.     The Alexanders are not proposing a "private jail" but
home incarceration, supplemented with private
security, in light of the District Court's concern
about their wealth.................................................5

        B.     Private security officers are third-party custodians as
contemplated by the Bail Reform Act .......................6

        C.     Private security officers are functionally equivalent to
court-approved corporate surety bondsmen.............11

        D.     The use of force, much less deadly force, is not
necessary to prevent the Alexanders' flight.............14

        E.     The government cannot explain why private security is
a bridge too far when the pre-trial system is riddled
with financial inequities.......................................16

        F.     The government does not address the Alexanders'
Eighth Amendment claims.......................................18

III.    The Government Urges This Court to Interpret *Boustani* in an
Unconstitutional Way..........................................................20

IV.    The Alexanders Proposed Conditions Are Sufficient to
Mitigate Risk of Flight And Danger to The Community...................22

        A.     The District court overstated the Alexanders' risk
of flight.............................................................23

        B.     The District Court erred in finding that the government
met its burden to show future dangerousness ..........25

CONCLUSION.....................................................................................30

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Bell v. Wolfish,*
441 U.S. 520 (1979)................................................................20

*Clark v. Martinez,*
543 U.S. 371 (2005)................................................................17

*Leary v. U.S.,*
224 U.S. 567 (1912)................................................................12

*Luis v. U.S.,*
578 U.S. 5 (2016)..................................................................16

*Morris v. Slappy,*
461 U.S. 1 (1983)..................................................................16

*Reno v. Koray,*
515 U.S. 50 (1995)..................................................................8

*Schultz v. Alabama,*
42 F.4th 1298 (11th Cir. 2022) ......................................12

*Stack v. Boyle,*
342 U.S. 1 (1951)..................................................................19

*Truong Dinh Hung v. U.S.,*
439 U.S. 1326 (1978)...........................................................24

*U.S. v. Atkins,*
2015 WL 4920831 (W.D. Pa. 08/18/15)..............................10

*U.S. v. Batista,*
163 F. Supp. 2d 222 (S.D.N.Y. 2001) ..................................9

*U.S. v. Berrios-Berrios,*
791 F.2d 246 (2d Cir. 1986) .............................................22

*U.S. v. Boustani,*
932 F.3d 79 (2d Cir. 2019) .......................................*passim*

*U.S. v. Dreier,*
596 F. Supp. 2d 831 (S.D.N.Y. 2009) ..................................7

ii

*U.S. v. English*,
629 F.3d 311 (2d Cir. 2011) ................................................................24

*U.S. v. Epstein*,
425 F. Supp. 3d 306 (S.D.N.Y. 2019) .......................................26, 27

*U.S. v. Esposito*,
749 F. App'x 20 (2d Cir. 2018) ...........................................................17

*U.S. v. Friedman*,
837 F.2d 48 (2d Cir. 1988) .................................................................23

*U.S. v. Hammond*,
204 F. Supp. 2d 1157 (E.D. Wis. 2002) ........................................ 8-9

*U.S. v. Karni*,
298 F. Supp. 2d 129 (D.D.C. 2004) ....................................................8

*U.S. v. McDuffie*,
451 F. Supp. 3d 281 (S.D.N.Y 2020) ..................................................8

*U.S. v. Nasr*,
2024 WL 3102178 (S.D.N.Y. 06/24/24) ...........................................10

*U.S. v. Romero-Martinez*,
2024 WL 965150 (D. Conn. 03/06/24)...............................................10

*U.S. v. Sabhnani*,
493 F.3d 63 (2d Cir. 2007) ........................................................15, 21

*U.S. v. Salerno*,
481 U.S. 739 (1987)............................................................19, 20, 25

*U.S. v. Stephens*,
447 F. Supp. 3d 63 (S.D.N.Y. 2020) ...................................................8

*U.S. v. Tiedemann*,
No. 95-406-1, 1999 WL 557950 (E.D. Pa. 07/29/1999) ....................8

*U.S. v. Vasquez-Robles*,
2025 WL 1090884 (E.D. Va. 04/07/25) ..............................................8

## Statutes and Other Authorities:

U.S. Const. Amend VI .........................................................................16

U.S. Const. Amend VIII ................................................................18, 19

18 U.S.C. § 3142(c)(iv) ...................................................................5

18 U.S.C. § 3142(c)(B)(i) ...............................................................6

18 U.S.C. § 3142(c)(l)(B)(i) ........................................................1, 18

18 U.S.C. § 3142(c)(1)(B)(xii) .....................................................11

18 U.S.C. § 3146(a)(1) ...................................................................9

18 U.S.C. § 3149 ...........................................................................14

18 U.S.C. § 3553(a)(2)(B)-(D) ....................................................28

*Pretrial Release and Misconduct in Federal District Courts, Fiscal Years 2011-2018*, 2022 Special Report of the U.S. Department of Justice, Office of Justice Programs, Bureau of Justice Statistics ....................................18

Duker, *The Right to Bail: A Historical Inquiry*, 42 Alb. L. Rev. 33 (1977) ..............................................................12

Funk & Mayson, *Bail at the Founding*, 137 Harv. L. Rev. 1816 (2024) ............................................................7

Helland & Tabarrok, *The Fugitive: Evidence on Public Versus Private Law Enforcement from Bail Jumping*, 47 J. L. & Econ. 93 (2004) .................................................................13

N.Y. Gen. Bus. Law §§ 70–89–a ................................................11

N.Y. Gen. Bus. Law § 71(1–a) ...................................................12

Orwell, George, *Animal Farm* (1945) ......................................19

S. Rep. 98-225, 14, 1984U.S.C.C.A.N.; 1983WL 25404 ....................................9, 13

iv

## INTRODUCTION

The government has not cited a single case where electronically-monitored home incarceration, supervised by a private security firm, failed to ensure a defendant's appearance in court or the safety of the community. Nor has the government met its burden to establish that releasing the Alexanders under those conditions would fail.

The Bail Reform Act is clear: the district court *shall* release a defendant "subject to the least restrictive…combination of conditions that such judicial officer determines will reasonably assure the appearance of [defendant] as required and the safety of any other person and the community." 18 U.S.C. § 3142(c)(l)(B). Those conditions may include that the defendant "remain in the custody of a designated person, who agrees to assume supervision and to report any violation of a release condition to the court, if the designated person is able reasonably to assure the judicial officer that the person will appear as required and will not pose a danger to the safety of any other person or the community." § 3142(c)(l)(B)(i).

The statutory inquiry is not whether an indigent defendant in another case could afford the same conditions proposed by the Alexanders. Relying on such a wealth-based inquiry to deprive the Alexanders of their liberty would violate Congress's clear mandate. Where the conditions of release are lawful and meet the statutory criteria, as they do here, detaining the Alexanders because defendants of

1

lesser means may not be able to meet those conditions is arbitrary and renders the detention punitive. The government has offered no authority to the contrary other than *U.S. v. Boustani*, 932 F.3d 79 (2d Cir. 2019)*,* a decision that itself cited no authority for proclaiming that a defendant who meets the statutory requirements must nevertheless be detained based on a generalized concern for socioeconomic equality. If that is what *Boustani* holds, then it was wrongly decided and should be overruled *en banc*.

The government altogether fails to address whether the proposed conditions were sufficient to release the Alexanders and instead asserts that the proffered conditions were "forbidden." D.E.#37.1:32. They argue that:

> Where, as here, *there are factors that require detention beyond a defendant's wealth*—including other factors going to risk of flight—the use of private security guards is *not permitted under the Bail Reform Act*.

D.E.#37.1:42 (emphasis added). But *nowhere* in the Bail Reform Act does it preclude private security as a condition of bond. Instead, private security is specifically contemplated by the statute, as it allows for third party custodians. The government has no argument to the contrary.

Our country embraces, not demonizes, success and lawfully attained wealth. And our Constitution does not guarantee absolute equality; it promises equal protection and equal opportunity. If the Alexanders' financial success allows them to propose a more robust exercise of their constitutional and statutory rights, neither

2

the Constitution nor the Bail Reform Act prohibit it. The conditions of release proposed by the Alexanders were a measured response to the concerns expressed by the government and the court regarding their wealth, consistent with *Boustani*. The conditions are lawful, effective, and will reasonably assure the Alexanders' appearance in court and community safety. This Court should grant release.

## I.     <u>Standard of Review</u>.

The government wrongly asserts that the standard of review is plain error because the Alexanders failed to argue in the District Court that "*Boustani* was wrong or that the Constitution required preferential treatment for wealthy defendants willing to pay for their own private jails." D.E.#37.1:21. To the extent that *Boustani* is binding precedent, it would have been futile to argue below that the District Court should not have applied it. This has no effect on this Court's standard of review.[1]

In any event, the Alexanders collectively argued below that "[t]he 'principle of fairness' dictates that Mr. Alexander should be treated no differently because he has means," Case No. 24-CR-00676 (Doc#27:3); "[t]he government's assertion that *Boustani* 'squarely forecloses' the condition of private security in this matter is wrong," *id.*; "equal protection principles mandate that a person may not be detained on the basis of his wealth any more than he may be detained on the basis of his

---

[1] The cases cited by the government regarding "plain error" occur in the post-conviction context, not in pre-trial appeals of detention orders.

3

poverty," *id.* (Doc#28:6); "Magistrate Judge Sanchez…was 'wary of bond conditions that would promote a two-tiered system of justice'...[b]ut as the Court explained in *Boustani,* imposing these conditions here will not implicate these concerns, because in this scenario, the principal reason Alon has been deemed a flight risk is *because of* his wealth," *id.* (Doc#20:12); "[i]ndeed, the government's position on risk of flight rests almost entirely on Alon's means. The condition of private security addresses this concern and does not foster inequality," *id.* (Doc#20:13); "criticisms of the armed security proposal…is not a reason to deny a constitutional right against someone who, for whatever reason, can provide reasonable assurances against flight," *id.* (Doc#28:6); and "a provision of the Bail Reform Act...contemplates that a defendant may be released into 'the custody of a designated person[] who agrees to assume supervision,' if that person is able reasonably to assure the judicial officer that the person will appear as required." *Id.* (Doc#28:7).

The Alexanders correctly set forth the proper standard of review in their initial brief. D.E.#22.1:33-35.

## II. <u>Private Security is Not a Statutorily or Constitutionally Prohibited Condition of Release.</u>

### A. *The Alexanders are not proposing a "private jail" but home incarceration, supplemented with private security, in light of the District Court's concern about their wealth.*

The government continues to push the hyperbolic narrative that the Alexanders are advocating for a "self-funded private jail" by proposing conditions of release that include private security. D.E.#37.1:19-21; 23,24,27,28,38,40. But this is a misnomer, characterized this way by the government to demonize wealthy defendants and rationalize their detention pretrial—even where the Bail Reform Act requires release.

The Alexanders are proposing home incarceration (commonly known as home confinement), a statutory and often-ordered condition of pre-trial release, with the additional condition of onsite security monitoring. *See* 18 U.S.C. § 3142(c)(iv) (listing "abid[ing] by specified restrictions on personal associations, place of abode, or travel" as possible conditions of release). The different forms of home confinement are detailed on Government Form AO-199b (Additional Conditions of Release), which follows Form AO-199A (Order Setting Conditions of Release). The Additional Conditions of Release list the following "location restriction programs" the courts may impose: "(7) The defendant must:"

☐ (p) participate in one of the following location restriction programs and comply with its requirements as directed.
    ☐ (i) **Curfew.** You are restricted to your residence every day ( ☐ ) from _____ to _____, or ( ☐ ) as directed by the pretrial services office or supervising officer; or
    ☐ (ii) **Home Detention.** You are restricted to your residence at all times except for employment; education; religious services; medical, substance abuse, or mental health treatment; attorney visits; court appearances; court-ordered obligations; or other activities approved in advance by the pretrial services office or supervising officer; or
    ☐ (iii) **Home Incarceration.** You are restricted to 24-hour-a-day lock-down at your residence except for medical necessities and court appearances or other activities specifically approved by the court; or
    ☐ (iv) **Stand Alone Monitoring.** You have no residential curfew, home detention, or home incarceration restrictions. However, you must comply with the location or travel restrictions as imposed by the court.
    **Note:** Stand Alone Monitoring should be used in conjunction with global positioning system (GPS) technology.

Form AO-199b, ¶7(p).

Thus, courts already impose "home incarceration." The additional condition of private security monitoring—approved by other courts in this circuit and proposed by the Alexanders in response to the government's *repeated* assertions that the Alexanders' vast wealth allows them to flee at a moment's notice, A-19;82-83; D.E.#21.1:68-69—does not warrant pejoratively re-labeling home incarceration a "private jail."

> B. *Private security officers are third-party custodians as contemplated by the Bail Reform Act.*

The government next claims that the Bail Reform Act's reference to a "designated person" who agrees to supervise a defendant and report violations to the court "is not an invitation to deputize private parties to exercise the coercive use of force over the defendant." D.E.#37.1:23; § 3142(c)(B)(i). Instead, the government argues, a designated person is "typically a family member or friend who is in a position to regularly observe and interact with the defendant and report to the district court, and who can exercise moral suasion over the defendant by virtue of their existing relationship." *Id*. The government does not elaborate on why a family

6

member or friend is an acceptable custodian for bail purposes but privately retained security guards, former or off-duty law enforcement officers who are in the same position to regularly observe the defendant and report to the court, are not.[2]

As set forth in the Alexanders' initial brief, historically "bail denoted the process of release: from the custody of the state to the 'friendly' custody of sureties—family, friends, employers, or neighbors who would guarantee the defendant's presence at court.'" Funk & Mayson, *Bail at the Founding*, 137 Harv. L. Rev. 1816, 1829 (2024). Fast forward to the present, the bail statute in its current form "contemplates that a defendant may be released into 'the custody of a designated person[ ] who agrees to assume supervision…if the designated person is able reasonably to assure the judicial officer that the person will appear as required.'" *U.S. v. Dreier*, 596 F. Supp. 2d 831, 833-34 (S.D.N.Y. 2009) (approving release to home confinement secured by electronic monitoring and "on-premises armed security guards"). According to the website of the U.S. Courts, for the 12-month period ending September 31, 2024, there were 2,321 defendants nationwide released to third party custody, of which 138 were in the Second Circuit.[3]

---

[2] The government's argument is also undermined by the government's admission that private security officers are acceptable custodians where a defendant falls within *Boustani'*s exception. D.E.#37.1:38.

[3] https://www.uscourts.gov/sites/default/files/2025-01/jb_h8_0930.2024.pdf

Nothing in the current bail statute requires that the "designated person" be a family member or friend, and courts have permitted others like religious leaders and employers to be custodians. *See U.S. v. Karni*, 298 F. Supp. 2d 129, 132-33 (D.D.C. 2004) (releasing Israeli national who resided in South Africa to the custody of a rabbi, who was ordered to "have someone with [Karni] on a twenty-four hour basis, seven days a week."); *U.S. v. Vasquez-Robles*, 2025 WL 1090884, at *2 (E.D. Va. 04/07/25) (releasing defendant into the custody of his employer); *U.S. v. Tiedemann*, No. 95-406-1, 1999 WL 557950, at *1 (E.D. Pa. 07/29/1999) (defendant released into an inpatient treatment program before house arrest); *Reno v. Koray*, 515 U.S. 50, 52 (1995) (defendant released into custody of a community treatment center).

The government relies on two cases, *U.S. v. McDuffie*, 451 F. Supp. 3d 281, 287 (S.D.N.Y 2020) and *U.S. v. Stephens*, 447 F. Supp. 3d 63, 67-68 (S.D.N.Y. 2020), to argue that "multiple courts have recognized" that the "'designated person' is typically a family member or friend" who "exercise[s] moral suasion over the defendant." D.E.#37.1:23. But neither of these cases support that proposition. *Stephens* and *McDuffie* are just two examples where a family member served as a custodian. Neither case discusses much less requires "moral suasion."

The case law reflects that "moral suasion" usually arises in relation to the suretor, not the proposed custodian. For example, in *U.S. v. Hammond*, the government sought to revoke a defendant's bail and argued "that the security offered

8

[was] insufficient because the posters lack[ed] substantial ties to defendant." 204 F. Supp. 2d 1157, 1166 (E.D. Wis. 2002). The court noted that it may "seek to assure itself that proposed posters or sureties are financially responsible and have 'moral suasion' over the defendant," but the fact that "several of the posters do not personally know defendant…is not an adequate reason to deny release." *Id.*; *see also U.S. v. Batista*, 163 F. Supp. 2d 222 (S.D.N.Y. 2001) ("defendant who presents some individuals with moral suasion and others who are financially responsible may satisfy the requirements of bail.").

And the legislative history of the Act shows that with respect to the third-party custodian, the focus was not on "moral suasion" but rather that the custodian be a responsible party who can supervise the defendant and report to the Court:

> The first condition…is the familiar third party custodian provision of existing 18 U.S.C. 3146(a)(1), with one major change…To assure that third party custodians are chosen with care, the condition has been amended to require that the custodian agree to report any violation of a release condition and that he be reasonably able to assure the judge that the person will appear as required and that he will not pose a danger to the safety of any other person or the community. It is not intended by this provision that the custodian be held liable if the person to be supervised absconds or commits crimes while under the custodian's supervision. Rather it is intended to alert the judicial officer to the necessity of inquiring into the ability of proposed custodians to supervise their charges and to impress on the custodians the duty they owe to the court and to the public to carry out the supervision to which they are agreeing and to report any violations to the court.

S. Rep. 98-225, 14, 1984 U.S.C.C.A.N. 3199; 1983 WL 25404 *14. Private security would be as good, if not better, than a parent or friend to fulfill the dual role of (1)

9

assuring the court that the defendant will appear and will not pose a danger, and (2) honoring the duty to the court and the community in supervising the defendant.[4]

Alon Alexander first proposed to be released to the custody of family members who wield "moral suasion:" first with his wife, confined to his own home. A-352. The government objected. A-352-353. Alon then offered to be released into his parents' custody and confined to their home. The government objected. A-352. Finally, Alon proposed to be released to his uncle's custody at his uncle's home. The government still objected. *Id.* It was only then that the Alexanders offered a high-rise condominium with one door in and one door out and no balcony and, for good measure, the additional safeguard of private security monitoring to assuage the government's concerns of flight. A-316. The Alexanders' immediate family also agreed to post bond in an amount equal to their entire life savings, rendering the family destitute if any of the Alexanders violate any condition of release. To top it off, Alon proposed a corporate surety. A-316. The Alexanders have more than satisfied both the financial and moral suasion requirements to be released on bail.[5]

---

[4] In fact, district courts sometimes reject friends and family as third-party custodians precisely because they are deemed too close to the defendant to serve as a reliable check on the defendant. *E.g., U.S. v. Romero-Martinez*, 2024 WL 965150, at *2 (D. Conn. 03/06/24); *U.S. v. Nasr*, 2024 WL 3102178, at *4 (S.D.N.Y. 06/24/24); *U.S. v. Atkins*, 2015 WL 4920831, at *6 (W.D. Pa. 08/18/15).

[5] In Catch-22 fashion, the government has also argued that the Alexander parents have agreed to pledge all their assets as a condition of release because they would willingly go destitute to aid their sons in fleeing, and therefore the massive bond

### C. Private security officers are functionally equivalent to court-approved corporate surety bondsmen.

Private security as a condition of pretrial release serves many of the same purposes as court-approved, corporate surety bondsmen. The security officer and the bondsman play a similar role in ensuring that a defendant complies with the conditions of release.

The bondsman is financially responsible for ensuring the defendant's appearance in court. *See* 18 U.S.C. § 3142(c)(1)(B)(xii) (court may require release subject to condition that defendant "execute a bail bond with solvent sureties; who will execute an agreement to forfeit in such amount as is reasonably necessary to assure appearance of the person as required[.]"). For assuming that obligation (risk), the corporate surety typically charges a non-refundable fee, usually a percentage of the face amount of the bond.

New York, by statute, specifically provides for the professional licensing of "bail enforcement agents," N.Y. Gen. Bus. §§ 70–89–a, defined as a person or company that engages in "the business of enforcing the terms and conditions of a

---

proposed is insufficient to mitigate risk of flight. Of course, if the parents were *unwilling* to risk all their assets, the government would surely argue that their unwillingness suggests that the parents lack confidence in their sons' commitment to abide by the court's order to appear—a "heads I win, tails you lose" proposition. The Alexanders' proposed conditions of a bond secured by their entire family's life savings, plus electronically-monitored house arrest augmented by privately retained security officers, plus a corporate surety, meets all these concerns.

11

person's release from custody on bail in a criminal proceeding, including locating, apprehending and returning any such person released from custody on bail who has failed to appear at any stage of a criminal proceeding[.]" N.Y. Gen. Bus. Law § 71(1–a).

The modern commercial bail industry is an extension of the common-law role of a surety, who would guarantee the accused's appearance in court and undertake to produce the accused in the event of non-appearance. Duker, *The Right to Bail: A Historical Inquiry,* 42 Alb. L. Rev. 33, 70 (1977). Over time, however, that role evolved from a personal obligation to a pecuniary one:

> It is said that the bail contemplated by the Revised Statutes (§ 1014, U. S. Comp. Stat. 1901, p. 716) is a common-law bail, and that nothing should be done to diminish the interest of the bail in producing the body of his principal. But bail no longer is the *mundium*, although a trace of the old relation remains in the right to arrest. Rev. Stat. § 1018. The distinction between bail and suretyship is pretty nearly forgotten. *The interest to produce the body of the principal in court is impersonal and wholly pecuniary.*

*Leary v. U.S.*, 224 U.S. 567, 575–76 (1912) (Holmes, J.) (emphasis added). The current system of permitting bondsmen to post bond on behalf of defendants strikes a balance between the interests of the government and promoting pretrial release of defendants. *See, e.g., Schultz v. Alabama*, 42 F.4th 1298, 1323–24 (11th Cir. 2022) ("[S]tates have 'a compelling interest in assuring the presence at trial of persons charged with crime.' At the same time, however, the defendants 'remain clothed with

a presumption of innocence and with their constitutional guarantees intact.'")
(cleaned up).

The defendant and the surety are jointly liable to the court if the defendant
fails to abide by the bond conditions imposed by the court. *See* Government Form
AO-98 (Appearance Bond) ("This appearance bond may be forfeited if the defendant
does not comply with the above agreement...At the request of the United States, the
court may order a judgment of forfeiture against the defendant and each surety for
the entire amount of the bond, including interest and costs."). Therefore, the
bondsman has skin in the game, "so bond dealers ask defendants for collateral and
family cosigners to the bond." Helland & Tabarrok, *The Fugitive: Evidence on
Public Versus Private Law Enforcement from Bail Jumping,* 47 J. L. & Econ. 93, 97
(2004). Thus, access to wealth is necessary for a defendant to obtain release under a
court-ordered, corporate surety bond.

In passing the Bail Reform Act of 1984, the Senate Committee chose to retain
the commercial surety bond condition, despite that it implicates the wealth of a
defendant. S. Rep. 98-225, 14, 1984 U.S.C.C.A.N. 3199; 1983 WL 25404 *1
("While the committee is aware of criticism of the surety bond system generally, and
of the recommendation of the American Bar Association to abolish the use of
commercial sureties, the surety bond option has been retained. However, the
obligation of commercial sureties to assure the appearance of their clients, and, if

13

necessary, actively to maintain contact with them during the pretrial period, is emphasized."). Congress therefore chose not to limit bail conditions to only those that are equally accessible to defendants of all economic classes. Supplementing home incarceration with monitoring by a private security firm at the defendant's expense resembles the statutorily authorized role of a bondsman, so it can be considered in the combination of conditions that will assure the court of a defendant's appearance and the safety of the community.

### D. The use of force, much less deadly force, is not necessary to prevent the Alexanders' flight.

The government claims that the Alexanders' private security proposal "indicates that the only way to ensure their appearance in court and protect the community is to authorize armed guards to monitor them at all times and be prepared to employ force against them," and that this is "far afield from the moral-suasion function of a third-party custodian." D.E.#37.1:24. Not so. A bondsman, too, has power to "employ force" to arrest and surrender a defendant to the court but, as explained above, courts may properly require a corporate surety bond as a condition of release. *See* 18 U.S.C. § 3149 ("A person charged with an offense, who is released upon the execution of an appearance bond with a surety, may be arrested by the surety, and if so arrested, shall be delivered promptly to a United States marshal and brought before a judicial officer.").

14

The Alexanders have established through presentation of witnesses and other evidence that the conditions they proposed—even without the private security feature—were sufficient to warrant their release. Given the government's repeated emphasis on their wealth, however, the Alexanders proposed the additional condition of private security—not because force might be required to ensure their compliance with conditions of release.

Finally, the government misstates the law set forth in *U.S. v. Sabhnani*, claiming that "if pre-trial supervision that relies on armed guards and the threat of force is required as a bail condition," then the facts "demand a defendant's detention." D.E.#37.1:24. But that is not what *Sabhnani* says. 493 F.3d 63, 74 n.13. (2d Cir. 2007). As a condition of pretrial release, the Sabhnanis and their children consented to "certain actions by private security officers—notably temporary preventive detention and the use of reasonable force—to thwart any attempts by defendants to flee." *Id*. at 74. They further agreed that the security officers could carry firearms while supervising their home detention. In vacating the detention order and remanding to the district court, this Court wrote: "To the extent this implies an expectation that deadly force may need to be used to assure defendants' presence at trial, that conclusion finds no support in the record before this court. Such a conclusion would, in fact, demand a defendant's detention." *Id*. Thus, this Court ruled that the need for *deadly force* would require detention, not that a defendant's

15

consent to private security using *reasonable force* warrants detention. Here, the Alexanders submit that no force, much less "deadly force," is necessary to prevent flight but would agree to such a condition should the Court require it.

>    E. *The government cannot explain why private security is a bridge too far when the pre-trial system is riddled with financial inequities.*

The government claims that the Alexanders' position is that courts "must deliberately exacerbate those inequalities [of the criminal justice system] by permitting wealthy defendants to hire their own prison guards to watch them at home, in circumstances where similar situated poorer defendants would be held at federal detention centers." D.E.#37.1:25. According to the government, this is "akin to fighting a fire with kerosene, rather than with water." *Id*. The government has it backwards. The reality that wealthier defendants can more robustly exercise their statutory and constitutional rights than the indigent is no basis to limit or deny the exercise of that right. *Compare Luis v. U.S.,* 578 U.S. 5 (2016) (defendants cannot be restrained from using their lawfully-earned resources to exercise their Sixth Amendment right to retain private counsel of their own choice) with *Morris v. Slappy*, 461 U.S. 1 (1983) (indigent defendants are relegated to accept appointed counsel of the court's choosing).

To be sure, not every defendant will have the means to post bail, offer money or property as collateral, or find sureties willing to tender their assets to secure the

defendant's bond. But Congress approved that system, and the Constitution does not forbid it.

The government has no response to this whatsoever, other than to say it would be "unfair" to "exacerbate" these inequities, but "unfair" is not the legal standard.[6] And to the extent that the government argues the condition of private security would "foster inequity and unequal treatment in favor of a very small cohort of criminal defendants who are extremely wealthy," and that there is "a compelling governmental interest in ensuring equal and fair treatment for all criminal defendants," it has not engaged in the proper constitutional analysis to determine if such unequal treatment is actually unlawful.[7] D.E.#37.1:26; 28. The statutory and constitutional principles that underride the Bail Reform Act are freedom, not absolute equality. The law *mandates* release on the least restrictive conditions that will assure a defendant's appearance and the community's safety, even if those

---

[6] Ironically, a year before the Second Circuit decided *Boustani*, this Court affirmed the district court's *requirement* that the defendant pay for private security as a condition of release. *U.S. v. Esposito*, 749 F. App'x 20 (2d Cir. 2018). Not only did the government defend the use of private security as an added measure of pretrial supervision, but this Court affirmed, holding that district courts are not precluded from requiring private security as a condition of release "when the defendant has substantial resources and such wealth *contributes* to his risk of flight." *Id.* at 24.

[7] *See also Clark v. Martinez*, 543 U.S. 371, 396 (2005) ("A litigant ordinarily cannot attack statutes as constitutionally invalid based on constitutional doubts concerning other litigants or factual circumstances.") (Thomas, J., dissenting).

17

conditions are not equally affordable to defendants of every socio-economic class. 18 U.S.C. § 3142(c)(l)(B)(i).[8]

Finally, the government is correct that *Weigand,* decided after *Boustani* and which permitted private security as a condition of release, "was an effort to ensure that all 'defendants are…treated similarly, without regard to wealth[.]" D.E.#37.1:26. *Weigand* applies equally here, where the Alexanders are being treated differently "primarily *because of*" their wealth. *Boustani*, 932 F.3d at 82. Indeed, the District Court emphasized the Alexanders' wealth, remarking that "a million dollars is nothing to this family," (A-454), and that the Alexanders "are exceedingly wealthy." (A-448).

Wealth—that is, the ability of the Alexanders to self-impose stringent conditions of release—is the very reason Judge Caproni refused to *even consider* those conditions altogether. This refusal *is* the violation of the Bail Reform Act that mandates reversal.

> F. *The government does not address the Alexanders' Eighth Amendment claims.*

The government fails to respond to, and thus apparently concedes, the Alexanders' arguments regarding the fact that bail—and accordingly excessiveness

---

[8] In fact, a 2022 report of the Department of Justice Office of Justice Programs states that for FY 2011-2018, there were 1,955 defendants who "were detained because they could not meet the monetary bond set by the court." https://bjs.ojp.gov/content/pub/pdf/prmfdcfy1118.pdf at page 8, Table 6.

under the Eighth Amendment—has always been an individualized inquiry. The government's argument here is that because the conditions proposed would be unattainable (excessive) for *some* defendants, they cannot be implemented by *these* defendants. *But see Stack v. Boyle*, 342 U.S. 1, 4 (1951) ("Since the function of bail is limited, the fixing of bail for any *individual defendant* must be based upon standards relevant to the purpose of assuring the presence *of that defendant*.").

The government also misapprehends the Alexanders' arguments regarding *U.S. v. Salerno*, 481 U.S. 739 (1987). *Salerno* reinforced the idea that excessiveness is a relative determination. *See id*. at 754 (conditions cannot be excessive *in light of the perceived evil*). The only "perceived evil" the district court was protecting here was a perceived lack of systemic equality—but even that argument falls flat, because the Alexanders' resources was one of the primary bases on which the government sought detention.

If the government is genuinely concerned about inequities in the pre-trial detention system that it perpetuates, the government should revisit its prosecutorial decisions in other cases involving indigent defendants, rather than violate the statutory and constitutional rights of the Alexanders in the name of remedying income inequality. *See* Orwell, George, *Animal Farm* (1945). The Constitution only allows pretrial detention that is regulatory, pursuant to the "narrowly focus[ed]" Bail Reform Act, which contains "a careful delineation of the circumstances under which

19

[such] detention will be permitted…" *Salerno*, 481 U.S. at 750, 751. Detaining the Alexanders for reasons beyond the regulatory objectives delineated in the Bail Reform Act transforms the detention into unconstitutional punishment before conviction. *Id*.; *Bell v. Wolfish*, 441 U.S. 520, 535 (1979).

### III.  The Government Urges This Court to Interpret *Boustani* in an Unconstitutional Way.

The government argues that under *Boustani*, the only time the court may authorize private security as a condition of release is when the defendant is detained solely because of his wealth. In the district court, the government said: "*Boustani* has only one very narrow circumstance. This private security type provision is allowed if, and only if, you have a risk of flight that is premised principally, *exclusively*, but for the defendant's wealth." A-471 (emphasis added). And in this Court, the government repeats that "where, as here, there are factors that require detention beyond a defendant's wealth—including other factors going to risk of flight—the use of private security guards is not permitted under the Bail Reform Act." D.E.#37.1:39. According to the government,

> the Bail Reform Act permits the use of private guards to avoid pre-trial detention *only* where the defendant is detained on risk of flight premised on his wealth…. This, however, is the exception to the rule and does not mean that in any circumstance where wealth contributes to a defendant's risk of flight that the defendant may pay for his own jailers, rather than be remanded. When wealth is just one of many factors, the condition is still forbidden.

D.E.#37.1:38. The government's position would lead this Court to adopt an unconstitutional reading of the holding in *Boustani.*

*Boustani* cannot mean what the government says, because wealth alone is never an appropriate basis for detention under the Bail Reform Act. By the government's interpretation, a defendant may only be released into the custody of private security when there are *no other factors* present requiring detention *other than wealth.* Following this logic, a defendant could be detained where the only factor supporting detention are his resources, or in other words, because he has the means to flee—even if not the intention to flee. Surely detention is not authorized based solely on a defendant's wealth.

To be sure, in *Boustani*, this Court wrote: "[T]he private-security condition we described in *Sabhnani* may be appropriate where the defendant is deemed to be a flight risk primarily *because of* his wealth." 932 F.3d at 82. "Primarily" does not mean "exclusively." If it did, such a holding would conflict with both the text of the statute and core constitutional principles. Instead, under *Boustani*, private security is appropriate "where the defendant is deemed to be a flight risk primarily because of his wealth," a standard the Alexanders have plainly met here, where the record is flooded with allegations that the Alexanders may use their access to vast wealth to flee. The government repeatedly argued that their immense wealth magnifies that risk of flight because of their ability to travel within a moment's notice; the

21

additional, proposed condition of private security monitoring mitigates that risk, and the Alexanders should be permitted to pay for this condition and be released under home detention.

In *Boustani*, this Court observed that detention was authorized, not primarily because of Boustani's wealth, but based on "Boustani's personal characteristics, including his 'alleged deceptive actions, … frequent international travel, *complete lack of ties to the United States, and extensive ties to foreign countries without extradition*.'" *Boustani*, 932 F.3d at 83 (emphasis added). For their part, the Alexanders were "Born in the U.S.A.," graduated from colleges in the U.S.A., are employed in the U.S.A. and have lived their entire lives in the U.S.A., with no "ties to foreign countries without extradition." The Alexanders do not pose the same flight risk that Boustani did.

## IV.     The Alexanders' Proposed Conditions Are Sufficient to Mitigate Risk of Flight And Danger to The Community.

Finally, the District Court erred by overstating the Alexanders' risk of flight and danger to the community. The conditions proposed by the Alexanders are more than sufficient to mitigate any risk of non-appearance or danger and Judge Caproni clearly erred by failing to consider them. *U.S. v. Berrios-Berrios*, 791 F.2d 246, 251 (2d Cir. 1986) (the district court has an "obligations to consider all possible alternatives to preventive detention"). This failure mandates reversal. *Id.* (reversible error where district court "fail[ed] to explain on the record" how the government

22

"had shown that no conditions" would assure the defendant's appearance); *U.S. v. Friedman*, 837 F.2d 48, 49 (2d Cir. 1988) (detention order will not be upheld where the district court made conclusory or "implied" findings). The government has made no argument as to why these conditions will not suffice here.

### A. The District Court overstated the Alexanders' risk of flight.

The government claims that the Alexanders "ignore entirely many of the justifications that Judge Caproni cited" and "do not even bother to address Judge Caproni's findings that the penalties they face after conviction or the substantial reputational harm they face during and after trial create enormous incentives to flee." D.E.#37.1:37. This is false. First, the Alexanders successfully rebutted these findings in the lower court by demonstrating the weaknesses in the government's case, discussed more, *infra*. Second, Judge Caproni's finding that the Alexanders' potential for "substantial reputational harm" makes them a risk of flight is clearly erroneous. The Alexanders have already been the subject of several high-profile articles and news reports attacking their reputation. If reputational harm were a basis for risk of flight, the Alexanders would have fled last summer when the Wall Street Journal reported on this investigation. Likewise, the fact that the Alexanders have not fled since they were made aware of this investigation on July 8, 2024, is the best evidence that the Alexanders have no intentions to flee. As the government

23

repeatedly asserted, the Alexanders certainly had the resources to leave the country before the charges were brought, but they did not.

The government also claims that the Alexanders did not meet their "heavy burden to show *an abuse of discretion* by the District Court" in overstating the Alexanders' foreign ties. D.E.#37.1:37 (emphasis added). As explained in Part I, that is not the legal standard. The Alexanders must show that the District Court's finding of risk of flight was "clearly erroneous." *English*, 629 F.3d at 319. Here, Judge Caproni clearly erred by relying on the Alexanders' limited foreign ties to Israel, despite recognizing their significant ties to Miami and New York: "[T]hey all have substantial ties to the United States[.]" A-519. The government cannot articulate why these tenuous foreign ties outweigh the Alexanders' substantial ties to the U.S.—nor can they articulate how, under the conditions proposed, the Alexanders would be able to flee to war-torn Israel, which extradites Americans and Israelis alike.

The government also claims that Judge Caproni was "under no obligation to accept the Alexanders' self-serving characterization of their 'inclinations.'" D.E.#37.1:38. But the Supreme Court says otherwise: there must be evidence of the "inclination" to flee. *See Truong Dinh Hung v. U.S.*, 439 U.S. 1326, 1327 (1978) ("[I]f these considerations suggest opportunities for flight, they hardly establish any inclination on the part of applicant to flee. And other evidence supports the inference that he is not so inclined.")

24

Finally, the government is wrong that Judge Caproni "did not rely" on wealth in finding risk of flight. D.E.#37.1:37. The government emphasized the Alexanders' wealth at every turn during the detention hearings. D.E.#21.1:60-61. Judge Caproni repeatedly acknowledged their wealth, commenting that "a million dollars is nothing to this family," and stating that "I did not interpret the government's position to be the risk of flight focuses on or rests on the defendants' wealth. I think their arguments was because of their wealth, they had the ability to make good on a desire to flee." A-407, 454. While Judge Caproni pointed out other factors, underpinning her decision to detain the Alexanders was their resources and ability to finance an escape.

> ### B. The District Court erred in finding that the government met its burden to show future dangerousness.

The government does not dispute that under *Salerno*, detaining a defendant "is the carefully limited exception," reserved for those cases where the government can prove, "by clear and convincing evidence[,] that an arrestee presents an identified and articulable threat to an individual or the community" "which no condition of release can dispel." *U.S. v. Salerno*, 481 U.S. 739, 751, 755 (1987). The government argues that the District Court properly found danger to an "unsuspecting woman to be drugged and raped" based on historic allegations underlying the charges against the Alexanders, the last of which was four years ago in 2021, and as to Alon Alexander, the last substantive allegation was nine years

ago, in 2016. According to the government, even though the alleged criminal acts date years into the past and there are no allegations of current or recent conduct, "the pattern of sex trafficking and violence is so extensive that reliance on that past conduct to predict future behavior is entirely reasonable." D.E.#37.1:31. The government cites *U.S. v. Epstein*, 425 F. Supp. 3d 306 (S.D.N.Y. 2019), for the proposition that Epstein, "a defendant who trafficked dozens of minor victims was properly detained on danger and flight grounds 14 years after the end of the charged conduct." *Id.*

But this is not a fair description of *Epstein*. Epstein was detained not because his conduct 14 years earlier was predictive of future behavior, but because leading up to his arrest, Epstein had defied and failed to comply with a court order requiring him to appear in New York and report to law enforcement officers, threatened and tampered with witnesses, paid off potential co-conspirators, considered pleading guilty to witness tampering, was in current possession of a trove of lewd images of minor girls, had a criminal history of having pled guilty to two sex offenses involving minors, and failed to comply with the sex offender registration requirements imposed on him following those convictions. *Id.* at 315-17. Two of Epstein's accusers testified at the detention hearing, providing their true names and testifying that they were in fear for their safety if Epstein was released. *Id.* at 314.

26

The *Epstein* court issued a detailed order making specific factual findings showing why Epstein posed an ongoing danger to the community. *Id.*

In contrast, Judge Caproni made no factual findings of future dangerousness other than recite the multi-years-old allegations against the Alexanders. None of the Alexanders' accusers testified at any of the detention hearings, and the government has still declined to provide any of their names, referring to them instead as Victim 1, 2, etc. A-421,437,477.

For their part, Alon and Oren Alexander each submitted to and passed a polygraph examination, denying the allegations that they had drugged the female accusers. Judge Caproni ignored that evidence altogether, characterizing it as a media ploy, and questioning the validity of polygraphs, asking counsel: "You believe in polygraphs," and stating that "polygraphs are not admissible." A-435.

The government argues that the district court "did not clearly err by placing little weight on a polygraph examination administered by someone the Alexanders hired themselves." D.E.#37.1:34. But the polygraphs were performed by a former FBI agent who trained other FBI agents on polygraph testing—his credentials were never questioned by the court. Just last week, the Department of Homeland Security made a public statement that it is using polygraph tests in the interest of national security. "The Department of Homeland Security is a national security agency," DHS

27

spokesperson Tricia McLaughlin said. "We can, should, and will polygraph personnel."[9]

As well, polygraphs are approved by the courts for use in supervising defendants post-conviction. The website of the U.S. Courts provides that polygraph testing can be used "as a means to ensure that [defendants] are in compliance with the requirements of [their] supervision or treatment program," and states that the *purpose* for polygraph testing is to determine *future danger*. It provides:

## Chapter 3: Polygraph for Sex Offender Management (Probation and Supervised Release Conditions) [10]

### C. Purpose

1. This condition serves the statutory sentencing purposes of public protection, deterrence, and rehabilitation. 18 U.S.C. § 3553(a)(2)(B)-(D).

2. The polygraph examination is used to provide historical information about the defendant's past behaviors, which is used for assessing risks and targeting treatment interventions, and to increase disclosure of activities, which may serve as a deterrent to re-offending behavior during the supervision period.

---

[9] https://thehill.com/policy/national-security/5184490-dhs-using-polygraph-tests-to-find-leakers-reports/

[10] https://www.uscourts.gov/about-federal-courts/probation-and-pretrial-services/post-conviction-supervision/overview-probation-and-supervised-release-conditions/chapter-3-polygraph-sex-offender-management-probation-and (emphasis added).

Thus, the Alexanders' polygraph results were weighty evidence showing that Alon and Oren are not a danger to the community.

Judge Caproni had no basis, much less clear and convincing evidence, to conclude that the Alexanders currently or in the future "pose a danger to unsuspecting women to be drugged and raped," (A-518), given the absence of even a single allegation of criminal activity in years (more than seven for Alon). And the conditions of release proposed by the Alexanders eliminate any concern that an "unsuspecting woman" will arrive at the apartment where the Alexanders would be under home incarceration (with their spouses and children, if permitted by this Court), supervised by armed, off-duty law enforcement officers (if required by this Court) who control the list of permitted visitors—each of whom must be pre-approved by Pretrial Services. A-44. This theory of dangerousness is entirely speculative, if not fanciful, and the government fails to explain why the conditions proposed by the Alexanders would not effectively mitigate this or any proposed risk of danger.[11]

---

[11] The government also overstates the strength of the evidence by placing undue weight on its own proffer. While the government may proceed by proffer at a detention hearing, such a proffer cannot be meaningfully weighed for credibility. The government offered no names, no corroboration, and no supporting evidence—only a narrative recited by the prosecutor and testimony by an FBI agent with no personal knowledge.

29

## <u>CONCLUSION</u>

For the foregoing reasons, the Court should reverse the District Court and remand with instructions to grant the Alexanders release pretrial under suitable conditions.

Respectfully submitted,

/s/ Howard Srebnick

| | |
|---|---|
| **RICHARD KLUGH** | **HOWARD M. SREBNICK** |
| LAW OFFICE OF RICHARD KLUGH | **JACKIE PERCZEK** |
| *Attorney for Defendant-Appellant* | **ALEXA KLEIN** |
| *Oren Alexander* | **JEANELLE GOMEZ** |
| 40 NW 3rd Street, PH1 | BLACK SREBNICK |
| Miami, Florida 33128 | *Attorneys for Defendant-Appellant* |
| (305) 903-6900 | *Alon Alexander* |
| | 201 S. Biscayne Boulevard, Suite 1300 |
| | Miami, Florida 33131 |
| | (305) 371-6421 |

30

## **CERTIFICATE OF COMPLIANCE**

This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B), the word limit of Local Rule 32.1(a)(4) (A) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 6,936 words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point font Times New Roman.

Dated: New York, New York
    May 22, 2025